Good morning, Your Honors. Kurt Hermanson on behalf of Mr. Maxwell. This case involves Title III, Congress's explicit protection of people's right to privacy and telephone conversations and wire communications, and where that intersects with the government's desire to try to keep us safe against criminal activity. And they really butted heads in this case where the government was claiming there were exigencies, there were exigencies, and the district judge decided to issue the warrant to allow for the wiretaps. But here, there was no showing of necessity, because the wiretap applications in this case used boilerplate language, were not specific, were not tailored, and therefore did not meet the necessity requirement. There were ten different traditional methods of investigation that could have been done. Only three were even attempted. Seven, the government didn't even try. Instead, they just made boilerplate, conclusory excuses. The only thing that was done in this case was telephone analysis, a search warrant of a telephone, pen registers, traps and trace. So they looked at that. And they made the excuse that that alone would be insufficient to meet all of the investigative needs. But as this court said in Blackman, you can't have this gigantic goal that would then make 2518 a nullity. Second, they minimally used a cooperative witness, even though they had a very cooperative witness who was very helpful. They made minimal use of that. And they didn't use the witness, Theresa Hall, who was the first person on calendar today. And they didn't use another cooperative witness. And the third thing that they did is minimal surveillance. They went to Gardner's, they did surveillance on Gardner's residence and said numerous times, well two is numerous times, we don't know how many times, but they didn't do surveillance on anyone else. What did they not do? What did they not even bother doing? First, they didn't get any grand jury subpoenas. Second, they didn't use any undercover officers. All they do is make excuses for that. And we know, as some of the things I cited in my reply brief, that they can be very successful at doing that. Third, they didn't conduct any interviews of anyone before resorting to wiretap. Instead, they jumped immediately to get a wiretap. Fourth, they didn't do any search warrants. Fifth, they didn't do any trash searches. And we know in this case that trash searches could have been helpful because the bank robberies included a bucket, a wig, Vaseline. These things would have been thrown away. We know that the robbers in these cases did, they had different vehicles, a van, getaway vehicles, and that they would just leave and abandon. Sixth, they didn't do parole. This is again, people are on parole, they're on probation. They didn't do probation or parole searches. They didn't stop vehicles and pull them over for a taillight being out. They didn't do any of those types of searches. You know, what seems to me was going on here from reading the colloquy between the judge and the FBI agent and everybody else in court was that they were concerned that another robbery was about to go down. I mean, this isn't a crime that happened and we're trying to figure out who did it. This is trying to intercept a series of robbers that are running around committing more robberies. The court, would that assist you in reacting to a robbery that was about to happen? If you were intercepting these phones, 100 percent, yes, it would. Very vital. That's what the court was worried about. These are crimes in series in progress. So all of the things that you're talking about, we sit around and go through all of those while the robberies continue. I agree that's why the court signed the warrant. The problem is that was the allegation, but it wasn't true. And the facts of this case proved that it wasn't true because what did they do? They had the wiretaps. The robbery that occurred in this case June 2nd is when Mr. Maxwell was arrested. They had the wiretaps from March, April, May, June. They heard about that robbery. They let it take place. So when that agent, Agent May, went in front of the judge and said, please, judge, we need this. This is a very important tool. And why can we jump over and skip over all of these traditional investigative means, even though we've already arrested someone and he's talked to us, Childs. Childs was a very helpful CW identifying people. Instead of investigating those people, they said, we need to stop further robberies because based on speculation, because they're going to run out of money and then they're going to commit another robbery. So what do they do? They do the wiretaps. They listen to them and they don't protect the public. They don't stop the robbery. And if they have an emergency situation, there is a procedure under 2518. And that's to – if there is an exigency, the statute provides for that. And it doesn't say that you can – the statute doesn't say you can skip over investigative means. You have to – you have to do the investigative means. The seventh thing is they didn't do consensual recordings. And that – they easily could have done that with Childs. In this case, they didn't even bother. So the exigency argument in this case is a red herring. And the authority for that proposition that you can't use exigencies that way is the Raina case, 218F3 at 1111. And it specifically says, 2518's requirements are not matters of mere etiquette to be disregarded when SPO exigencies or exigencies regarded – used to spy on people make compliance inconvenient. So in this case, they – the other thing they did was they targeted six cell phones instead of just going for one. So they immediately got a search and listened to six different cell phones instead of just asking for one. They had six physical addresses that they could have surveilled, but they failed to even try. So I think the record's clear that there were numerous things they could have done and they completely failed to do. And I'd like to reserve the rest of my time for rebuttal.  Good morning, Your Honors. Stephanie Christensen for the United States. I think what's important to remember about this case is the state of the investigation at the time the application is submitted to Judge Wilson. What the FBI knows on March 31st is that two violent robberies have already occurred, one on March 1st in which an armored truck guard was murdered by a robber using an AK-47, and the second just two days later on March 3rd where a shot was discharged inside of the bank. And the FBI knows that these two robberies are related or has reason to believe that they are related. And they also have reason to believe that there's a hierarchy involved here, that this is a conspiracy, that the robberies are being committed by independent sort of crews within the Rolling 30 street gang. And that it's not just the individuals who are inside of the bank that are accountable for these robberies, but shot callers, those who are organizing these robbery crews who are not actually on the ground. And the affidavit sets forth in numerous details about the reasons why normal investigative techniques will not serve to inform the FBI of who these shot callers are, who are the ones that are beyond just the robbers that are going into the bank. I note that what the FBI had done to this point was not just a surveillance and not just phone analysis. We have recovered vehicles involved in both the March 1st and the March 3rd robberies. They're doing a registered owner comparison on those vehicles. They had interviewed Childs, this is a defendant who was apprehended after the March 3rd robbery. They debriefed Childs in post-arrest statements before he had a lawyer. And the affidavit notes that defendant Childs has no reason to really cooperate after that point because he's also facing state charges for the murder of a convenience store clerk. The affidavit also explains that an interview of another one of the target subjects, this is Teresa Hall, which occurred after the March 3rd robbery, and Teresa Hall denied any involvement with that robbery, although she would later be charged and convicted of that. There was also a search warrant executed in this case, not of a location, but of a cell phone by a defendant Childs who was apprehended. You have pen registers, track and trace devices that were used in this case. You have surveillance of a defendant Gardner, who was one of the individuals named by defendant Childs as being involved in the March 1st robbery with the murder of the armored truck guard. All of these techniques being employed by the FBI and the other agencies involved in this case in the 28 days between the March 3rd robbery and the March 31st application. You also note that on March 31st, the day that the wiretap application is presented to the court, the FBI is faced with a robbery that's going on by the same crew that very morning. And it's reflected in the transcript of the hearing where the agent comes before the court and explains to Judge Wilson that that very morning another robbery had occurred, and yet another individual, one of whom was actually a target subject in the wiretap application, and was caught with target telephone number one. That very morning, Your Honor, there were five cell phones that were used in this case. I think defense counsel said six, but there were actually five target telephones that were the subject of this application. And I think what's most important about this is the standard of review. We have Judge Wilson, who is presented with all of these facts, and he exercises his discretion, and he says, yes, I believe that this wiretap application is full and complete, and that this wiretap is necessary in order to meet the goals of the investigation, which are very specific goals. It's not just to bring justice backward-looking to the victim of the armored truck robbery and the individuals who were inside of the bank, but also forward-looking to prevent future crimes. I think exigency is something that absolutely can be considered by this Court. I think even without the exigency, the affidavit stands on its face. However, this Court's precedent really does allow it to consider the circumstance that Judge Wilson was faced with here, and that is you view the necessity of a wiretap through the lens of reasonableness. The good-faith efforts of the investigative team here to try and bring down this robbery crew without the use of the wiretap. And this Court's precedent in Spanulio says a reasonable amount of time here. So what you have is a robbery crew committing violent robberies. All indications are that another one will occur, and, in fact, one did occur the very morning of the wiretap application. And the FBI did undertake significant investigative measures before applying for this wiretap. It is not the first step that they took. Could they have done more? Yes, they could have. Were they required to? No, they weren't. And did Judge Wilson abuse his discretion in so finding? Absolutely not. There's a second issue that's raised on the appeal as well, which has to do with the error or the mistake in the wiretap application and order. This is the mistake on behalf of the government where it could. Hilarical error. Indeed, Your Honor. This is the name of the affiant that was in the application and order, which was put forth as Mark Trott. Were the application and the affidavit presented at the same time? Absolutely, Your Honor. There's no indication of confusion on the part of Judge Wilson. Agent May, his name was on the affidavit. Agent May signed the affidavit. He swore to those facts. Agent May was present. In Judge Wilson's presence. Absolutely, Your Honor. So there's no indication. This is not a situation of facial invalidity. And it's certainly. Very determined to conceal the name Trott. Perhaps, Your Honor. I doubt that. It's really a situation where there is a robbery occurring the morning of the wire signing. And so the fact that a different agent came and that that last-minute switch was not caught by the government is certainly not something that is even facially valid, let alone calling for suppression. Did this warrant have to go through the usual Washington process of being approved by the FBI, submitted to the criminal division, and then transferred out to the field? Or is there some emergency procedure that circumvents that? No, Your Honor. This application did go through OEO and the electronic surveillance unit as part of the Department of Justice. The actual authorization for those is attached as part of the application and order. You can see that the date of Department of Justice approval, where the Attorney General or his designee must sign off on that application, is dated March 31st, which is the same date as the application and order submitted to Judge Wilson. But it had been submitted to the Department before that time. This went through pretty fast, then? Your Honor, I don't know the date of submission to the Department of Justice, so I can't tell you their period. But I can tell you that the date is the same. And it is not unusual, of course, for Washington, who is three hours ahead of us, to have approved an application, sent it back, and plenty of time to get before a court in the same day, should the court's calendar permit that to happen. And with that, Your Honor, if the court has no further questions, the government will submit on its briefs. Thank you, Your Honor. The bottom line in this case is that even though they felt that there was time pressure, I think the only reason the judge signed the order is they thought that there was exigency. But this circuit's case law in RENA says that exigency can't excuse and can't allow a judge to sign an order and just jump over all the procedures that should be taken advantage of. And, yes, this was a very important one. So there's a mandatory requirement that you follow your ten points, you said? No, there isn't. But it's the general reasonableness standard and what should be done and what is normally done, what is traditional and what can be done. This was a very important case, and the FBI expended, I'm sure, huge resources in trying to find and in finding and prosecuting the people involved. There's no reason they couldn't go out and do everything simultaneously, stop cars, do searches, do searches on the cell phones, especially after – and I think it is important to consider what they already had. They did have the cell phone number warrant. They had Childs. It's Childs State Hall who wouldn't cooperate, and then there was apparently another confidential informant who's not named. Correct. And Childs, the government argues, well, he had no reason to 5K. He had no reason to cooperate just because he had other charges, and that really defies logic. He had already cooperated and just to make – Hall denied any involvement. She wasn't cooperating. Right. She cooperated later and testified against co-defendants. At the time, she just said she was there to give a ride. But Childs, when he was arrested, he gave it all up. He told them the monikers of the people involved. He told them the plan. And what does that mean? That means that instead of going and getting the search warrant immediately, they should have met with him again. And done what? And found out and had him make – it's very simple to have him make phone calls to his cohorts. They had his phone. They had him. He gave himself shot probably. So they should have relied on the bank robber to help them. You've read our cases about how dangerous informants are and how unreliable they are and the jury instructions don't believe them. I mean, we even have an opinion that says the gold standard is the wiretap because then you really know what's happening rather than relying on the word of a crook who's trying to weasel his way out from under a bunch of charges. Well, you don't need to rely on him. I'm not talking about testifying in a trial. I'm talking about using him to make phone calls. They're as bad in the field as they are in the courtroom, if not worse. They wouldn't even have to let him out, though. He can make phone calls from the U.S. Attorney's office, from the FBI's office, from jail. And make funny statements over the phone, alerting everybody. Right. And you don't think the gang, the people involved in the gang who were committing these robberies would figure that out pretty quickly? All of a sudden, he's gone. All of a sudden, he's making phone calls, you know, with a script. Well, obviously, they knew that... He was gone. Yeah, they knew that he was gone. Now he's supposed to call them up and get incriminating evidence from them over the telephone? Well, it's been done many times. He can say, hey, I'm in jail, and talk to them. And with GPS technology, I mean, we've all seen many trials lately where they can find exactly where that person is. CSI, oh, my God. Well, it's not fantasy. My phone tells me where, and tells my friends where I am right now. They know exactly where I am on my phone. I can see where my investigator is. It's scary, but it's reality. How do you see that on your phone? I have the droid. It's a new phone. You also have it. I love my phone. So they can see him and see that he's in jail? I mean, if you can see them, I mean, you're telling somebody... Well, the FBI technology is much better than what I have. Oh, so then they can't... so then it's blocked, and that's not going to send them anywhere. How do I get those phones for my kids? Yeah, it's a great tool for parents to watch for their children. Go to the vet and have a chip put in them. But, I mean, they could easily find out where these guys are by him talking to them, and then they can zero in on their location. There are a lot of things that they could have done that they didn't do. And more and more cases, unfortunately, are going... Our privacy's gone, pretty much. And I understand the reason, but Congress has decided to try to protect our privacy since 1968, and opinion after opinion after opinion has said things like this is the gold standard. But, unfortunately, this is the go-to now. Just give the judge the part of the plate. They signed it before, they'll sign it again, and this is the reality. I was looking pretty carefully at that, because, as you know, I just sent it in Blackman, and I think Blackman was... I still think it was wrong, because I think it went too far the other way. But the problem is this affidavit really... There might have been one or two places where there was boilerplate. It actually was quite specific. Not... It was specific about how a pen register doesn't give... It gives you limited information, so it was specific about... Yeah, going through the trash. They couldn't necessarily link it with any particular gang member, and they did do surveillance of Gardner, and he was moving from place to place. I guess it was at his mother's house. They couldn't find anything that they could even arrest him on. I mean, there was a lot of very specific stuff in this one. I would respectfully disagree, because, I mean, they just said, we can't do trash searches because they wouldn't be productive. All right, thanks very much. Thank you. Thank you. Have a good night. Case just argued will be submitted. Next case is Alvarez-Enriquez v. Holder. Submitted. Submitted on the base. Yay. Next case. Gabbo. Gabbo v. Holder.
judges: Reinhardt, Trott, Wardlaw